IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-23435-CIV-MOORE/SIMONTON

NATIONAL FRANCHISEE
ASSOCIATION,

      Plaintiff,

vs.

BURGER KING CORPORATION,

      Defendant.

_____/

## ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

      THIS CAUSE came before the Court upon Defendant's Motion to Dismiss (dkt # 17).

Plaintiff filed a Response (dkt # 24) and Defendant filed a Reply (dkt # 26).

      UPON CONSIDERATION of the Motion, the Response, the Reply, the pertinent portions

of the record, and being otherwise fully advised in the premises, the Court enters the following

Order.

## I.    BACKGROUND

      This case involves a class action concerning the obligations of corporate franchisees under

their franchise agreements.  Plaintiff National Franchisee Association ("NFA") is organized and

exists for the purpose of protecting and preserving the rights of its Burger King franchisee

members ("Franchisees") and serves as the official voice of the Franchisee community.[1]

Defendant Burger King Corporation ("BKC") has been in the business of selling food products

for decades.  BKC grants franchisees permission to operate its restaurants.  Each BKC franchisee

restaurant is required to execute a Franchise Agreement ("Agreement") which is materially

_____

[1]The following facts are taken from the Complaint.

identical among all BKC franchisees.  All BKC franchisees may be members of the NFA and

approximately 75% of them are currently NFA members.  BKC franchisees may also be members

of their respective geographical "regional associations" of franchisees and those regional

associations are themselves members of the NFA.

Since at least the late 1960's, BKC had allowed Franchisees to set prices on the various

products they sold.  In 2002, however, BKC issued its "99 cent BK Value Menu Policy

Statement" in which it asserted for the first time that it had the right, under the Agreements, to

dictate the maximum price a Franchisee can charge for certain products sold in their restaurants.

In the statement, BKC asserted that recent changes in the law allowed it to set maximum prices.

BKC put its 2002 Value Menu proposal to a Franchisee-wide vote and it passed with agreement

of two-thirds of the Franchisees.  In 2005, BKC sought to introduce a new $1.00 Value Menu

and sent all Franchisees a "Show of Support Voting Form" ("2005 SOS").  In connection with the

2005 SOS, BKC issued a statement that "[i]f this Show of Support receives 67.7% [sic] yes votes

- the six national Value Menu items will be required items at $1.00."  Compl. ¶ 28.  The 2005

SOS vote passed and BKC instituted its new $1.00 Value Menu.

In early 2008, BKC announced its intention to place its double cheeseburger product

("DCB") on the $1.00 Value Menu.  The NFA and the Franchisees objected to both BKC's

contention that it had the unilateral right, under the Agreements, to add items to the Value Menu

and also to the specific proposal to add the DCB to the Value Menu.  Due to the Franchisees'

objections, BKC abandoned the idea.  In 2009, however, BKC again tried to place the DCB on

the $1.00 Value Menu.  On two occasions, BKC submitted the proposal to a vote by the

Franchisees, who twice rejected the proposal.  Part of the Franchisees' reason for rejecting the

2

proposal is their claim that it costs the Franchisees more than $1.00 to produce the DCB -
something that is not true of any other item previously placed on the Value Menu.  Nonetheless,
BKC announced that it was requiring all BKC franchisees, starting on October 19, 2009, to offer
the DCB on the Value Menu for $1.00.  This was the first time that BKC imposed a maximum
price on its franchisees without their majority consent.

The NFA filed its Complaint (dkt # 1) on November 10, 2009, seeking a declaratory
judgment that BKC does not have the authority under the Agreement to impose maximum prices,
including the $1.00 DCB.  On December 11, 2009, BKC filed the instant Motion to Dismiss (dkt
# 17) arguing that: (1) the Eleventh Circuit has already determined that Section 5 of the
Agreement gives BKC the authority to impose maximum prices on products sold by the
Franchisees; (2) the NFA's claim is barred by the statute of limitations; and (3) the NFA does not
have standing to assert its claims on behalf of the Franchisees.  On May 6, 2010, this Court held a
hearing on the issue of associational standing.  Specifically, the Parties addressed the NFA's
standing to bring this action in light of: (1) the NFA's argument that the Agreement is ambiguous
and its reliance on the intent of the Parties to determine the meaning of Section 5 of the
Agreement; and (2) the NFA's argument that BKC violated its duty of good faith by setting the
maximum price of the DCB at $1.00.

**II.   STANDARD OF REVIEW**

A.   Motion to Dismiss Pursuant to Rule 12(b)(1) for Lack of Subject Matter
Jurisdiction

As the Eleventh Circuit explained in Morrisson v. Amway Corp.:

> Attacks on subject matter jurisdiction under Rule 12(b)(1) come in
> two forms, 'facial' and 'factual' attacks.  Facial attacks challenge

3

subject matter jurisdiction based on the allegations in the complaint, and the district court takes the allegations as true in deciding whether to grant the motion. Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings. In resolving a factual attack, the district court may consider extrinsic evidence such as testimony and affidavits.

323 F.3d 920, 925 n.5 (11th Cir. 2003). Here, BKC's Motion to Dismiss is a facial attack because it is based solely upon the NFA's Complaint and the documents referenced therein. Therefore, in determining whether the NFA has sufficiently alleged a basis of subject matter jurisdiction, this Court will take the allegations in the Complaint as true. See also Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990).

### B. Motion to Dismiss Pursuant to Rule 12(b)(6) for Failure to State a Claim

A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). On a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007)). A complaint must contain enough facts to indicate the presence of the required elements. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1302 (11th Cir. 2007). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002). However, a well-pleaded complaint will survive a motion to dismiss "'even if it

4

appears that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III.    ANALYSIS

BKC raises three arguments in its Motion to Dismiss: (1) the NFA's claim is barred by the doctrine of *stare decisis* because the Eleventh Circuit in Burger King Corp. v. E-Z Eating, 41 Corp., 572 F.3d 1306 (11th Cir. 2009), has already determined that Section 5 of the Agreement gives BKC the authority to impose maximum prices in its Value Menu; (2) the NFA's claim is barred by the statute of limitations because the alleged breach occurred, if at all, in 2002; and (3) the NFA lacks associational standing because it failed to identify a member that would have standing and its claim requires the participation of individual Franchisees.  Because BKC's standing argument contests this Court's subject matter jurisdiction, this Court must address whether the NFA has standing to bring this action before reaching the merits.

### A.    Standing

Motions challenging standing attack the Court's subject matter jurisdiction and are therefore considered pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  See Doe v. Pryor, 344 F.3d 1282, 1284 (11th Cir. 2003).  If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case.  To determine whether a party has standing, a Court must decide "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise."  See Warth v. Seldin, 422 U.S. 490, 498 (1975).  The threshold question for these constitutional

5

limitations is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." Id. at 498-99.  A plaintiff invoking federal jurisdiction must allege "a personal stake in the outcome of the controversy." Id. (citing Baker v. Carr, 369 U.S. 186, 204 (1962)).  Pursuant to Article III of the U.S. Constitution, a court's judicial power exists "only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." Id. at 499 (citations omitted). Apart from this minimum constitutional mandate, "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Id.

Associational standing is an established category of Article III standing that allows an association to bring a complaint on behalf of its members. See N.Y. State Club Ass'n, Inc. v. City of N.Y., 487 U.S. 1, 9 (1988).  An association has standing to sue on behalf of its members only when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  The NFA asserts that it has associational standing to sue on behalf of its Franchisee members.  BKC argues that the NFA has not met the first and third Hunt requirements for associational standing.

1.    Standing of Individual Members

An individual plaintiff has standing under the Constitution's "case or controversy" requirement where the plaintiff has: (1) suffered an "injury in fact" that is concrete and

6

particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). At least one member of the association must meet the standing requirements. Sierra Club v. Tenn. Valley Auth., 430 F.3d 1337, 1344 (11th Cir. 2005). Because the NFA has invoked federal jurisdiction, it has the burden of proving these elements. Lujan, 504 U.S. at 561 (citations omitted). At the motion to dismiss stage, the NFA must merely present factual allegations that would satisfy the standing requirements. Id. (citation omitted).

As an initial matter, BKC's argument that the NFA does not have standing to represent all BKC franchisees because not all BKC franchisees are members of the NFA is misguided. The NFA brought this action "on behalf of its members and on behalf of a class comprised of all the Franchisees." Compl. ¶ 2. At this stage of the litigation, the NFA's action is only on behalf of its Franchisee members. The NFA's action would only be extended to all BKC franchisees should it succeed in certifying a class. BKC's argument that the NFA lacks standing because it has failed to identify a single franchisee that has standing also fails. It is the responsibility of the plaintiff to clearly "allege facts demonstrating that he is the proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Warth, 422 U.S. at 518. The NFA has done so here. It has alleged that "at least one of its members . . . will suffer injury in fact by the real and immediate threatened harm from BKC's actions in setting a mandatory maximum retail price for the DCB - and to set that price below what it costs the franchisees to produce and sell it." Compl. ¶ 7. Taken as true, the NFA's allegation meets the first Hunt requirement.

2.    Participation of Individual Members

BKC asserts that the NFA's cause of action requires the participation of individual

Franchisees to an extent that violates the third <u>Hunt</u> requirement.  While individual participation is

generally required when a claim seeks monetary damages, claims seeking a "declaration,

injunction, or some other form of prospective relief" do not typically require such participation.

<u>See</u> <u>Hunt</u>, 432 U.S. at 343 (citing <u>Warth</u>, 422 U.S. at 515).  A court's inquiry into the extent

individual participation is required does not end, however, simply because a claim seeks

declaratory relief.  <u>See</u> <u>Bano v. Union Carbide Corp.</u>, 361 F.3d 696, 715 (2d Cir. 2004) (noting

that simply because a party seeks equitable relief rather than damages does not mean that the third

<u>Hunt</u> prong is automatically satisfied).  The extent of individual participation required is

determined not only by looking at the nature of the relief sought, but also at the nature of the

claim as alleged.  <u>See</u> <u>Hunt</u>, 432 U.S. at 343.  Only where the individual participation of "each

injured party [is] indispensable to proper resolution" of the case, will the third <u>Hunt</u> requirement

be violated.  <u>Warth</u>, 422 U.S. at 515-16.

At the hearing, both Parties argued that the language of Section 5 of the Agreement

should be unambiguously read in their respective favor.  Tr. at 8:2-16; 16:10-19.  The NFA

specifically noted that while their Response presented various arguments on ambiguity and intent

of the Parties to the Agreement, its ambiguity argument was at most, an alternative argument.  Tr.

at 8:9-16.  As discussed below on the merits, this Court concludes that the language of Section 5

is unambiguous and therefore, its meaning may be determined as a matter of law without

participation of each individual Franchisee.  <u>See</u> <u>Int'l Union, United Auto., Aerospace and Agr.</u>

<u>Implement Workers of Am. v. Brock</u>, 477 U.S. 274, 287 (1986) (holding a pure question of law

does not require the individual participation precluded by <u>Hunt</u>).

8

NFA also alleges that even if this Court were to determine that BKC had the right to set maximum prices under Section 5 of the Agreement, BKC's imposition of the $1.00 DCB on the Franchisees violates its duty of good faith.  BKC has a duty of good faith under both the express terms of Section 5 and the implied covenant of good faith and fair dealing under Florida law.[2]

With respect to BKC's contractual duty of good faith, Section 5 of the Agreement states that BKC can only make changes and additions to the BKC Operating system "which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary . . . ." Agreement § 5(A), Def.'s Mot. Ex. A (dkt # 17-1).  Therefore, even if this Court determines that BKC has the authority to impose maximum prices under Section 5, we must still determine whether BKC's decision to impose the $1.00 DCB on the Franchisees was made "in the good faith exercise of its judgment" because it was "desirable and reasonably necessary."  This determination, however, does not make the participation of each individual Franchisee indispensable to a proper resolution of this case.  Section 5's good faith provision evokes a broad view of BKC's decision to include the DCB on the dollar Value Menu.  The standards imposed through Section 5 are uniform throughout BKC's franchise system.  Moreover, this case was brought on behalf of all Franchisees with the potential to be extended to a class including the non NFA-member BKC franchisees.  This will require a level of uniformity among the claims and grievances of each member of the class.  Our primary focus in determining whether BKC breached Section 5's good faith provision, therefore, is on whether BKC itself made the decision in good faith that, on a franchisee-wide basis, placing the $1.00 DCB on the Value menu was

---

[2]Under Florida law, every contract includes an implied duty of good faith.  <u>Burger King Corp. v. Ashland Equities, Inc.</u>, 217 F. Supp. 2d 1266, 1278 (S.D. Fla. 2002).

desirable and reasonably necessary. The NFA represents that it does not intend to prove BKC acted in bad faith by resorting to individual determinations but instead, by reference to BKC's own internal documents and data, and by providing expert testimony. Tr. at 12:1-23. The same holds true with respect to the implied covenant of good faith and fair dealing, which, under Florida law, provides that "one party cannot capriciously exercise discretion accorded it under the contract so as to thwart the contracting parties' reasonable expectations." Burger King Corp. v. Ashland Equities, Inc., 217 F. Supp. 2d 1266, 1278 (S.D. Fla. 2002) (citations omitted). Because of the nature of the NFA's claims, the NFA must prove, on a Franchisee-wide basis, that BKC imposed the $1.00 DCB in bad faith. While it remains to be seen if the NFA can do so without resort to individual determinations, this Court declines to deny the NFA standing to bring its action at this stage of the litigation.

B.   BKC's Authority Under Section 5 of the Agreement to Impose Maximum Prices

1.   *Stare Decisis*

BKC asserts that NFA's claim is barred by the doctrine of *stare decisis* because the Eleventh Circuit in Burger King Corp. v. E-Z Eating, 41 Corp., 572 F.3d 1306 (11th Cir. 2009), has already determined that Section 5 of the Agreement gives BKC the authority to impose maximum prices on its Franchisees.[3] The NFA counters that BKC's authority to impose

---

[3]BKC relies on the doctrine of *stare decisis* to argue that this Court should follow the Eleventh Circuit's ruling in Burger King Corp. v. E-Z Eating, 41 Corp., 572 F.3d 1306 (11th Cir. 2009). The principles of *stare decisis* and binding precedent are distinct. Johnson v. DeSoto County Bd. of Comm'rs, 72 F.3d 1556, 1559 n.2. "The doctrine of *stare decisis* accords a court discretion to depart from one of its own prior holdings if a compelling reason to do so exists." Id. "The binding precedent rule affords a court no such discretion where a higher court has already decided the issue before it." Id. While BKC references *stare decisis*, its arguments regarding the Eleventh Circuit's ruling are properly categorized under the binding precedent rule.

maximum prices pursuant to Section 5 was not disputed in either the district court case, <u>Burger King Corp. v. E-Z Eating 8th Corp., et al.</u>, Case No. 07-20181-CIV-COOKE (S.D. Fla., filed Jan. 23, 2007) (Order Granting Summary Judgment, Def.'s Mot. Ex. B (dkt # 17)), or the Eleventh Circuit appeal, <u>E-Z Eating, 41 Corp.</u>, and therefore, the Eleventh Circuit Court did not expressly rule on this issue.[4]

In <u>E-Z Eating 8th Corp</u>, BKC claimed that the franchise owners of two BKC restaurants breached their franchise agreements by shutting down their restaurants before the expiration of their Agreements, and as a result, they owed BKC lost profits and advertising contributions. Order Granting Summary Judgment, Def.'s Mot. Ex. B (dkt # 17-2). The franchise owners counterclaimed that BKC's imposition of the Value Menu was causing them extreme losses and BKC failed to provide services in accordance with Section 6(I) of the Agreement. <u>Id.</u> They also argued that the imposition of the Value Menu violated BKC's duty of good faith and fair dealing. <u>Id.</u> Section 6(I) states that BKC agrees to provide: "Such ongoing support as BKC deems reasonably necessary to continue to communicate and advise FRANCHISEE as to the Burger King System including the operation of the Franchised Restaurant." <u>Id.</u> at 12; Agreement § 6(I), Def.'s Mot. Ex. A (dkt # 17-1).

The franchise owners' argument was that, by imposing the Value Menu and failing to

---

[4]This Court takes judicial notice of <u>Burger King Corp. v. E-Z Eating 8th Corp., et al.</u>, Case No. 07-20181-CIV-COOKE (S.D. Fla., filed Jan. 23, 2007) and <u>Burger King Corp. v. E-Z Eating, 41 Corp.</u>, 572 F.3d 1306 (11th Cir. 2009) pursuant to Rule 201 of the Federal Rules of Evidence. Fed. R. Ev. 201; <u>United States v. Jones</u>, 29 F.3d 1549, 1553 (11th Cir. 1994) (noting a court may take notice of another court's order for the limited purpose of recognizing the judicial action taken or the subject matter of the litigation).

provide the services described in Section 6(I), despite BKC's knowledge that the Value Menu was causing the franchise owners extreme losses, BKC prevented the franchise owners' performance under the Agreement.  Order Granting Summary Judgment at 12-15, Def.'s Mot. Ex. B (dkt # 17).  The District Court explicitly rejected this argument stating that under Section 5(A) of the Agreement: "BKC has the right, under the parties' franchise agreements, to require compliance with the Value Menu.  The franchise agreements specifically require Defendants to adhere to BKC's comprehensive restaurant format and operating system."[5] Id. at 13-14.  The District Court held that because BKC had the authority to impose the Value Menu, it could not be held in breach of the franchise agreement by doing so.[6] Id. at 14.  The District Court further supported its determination by noting that "Defendants even testified at deposition that they understood that BKC had the right to require their participation in the Value Menu Program." Id.

The franchise owners appealed the District Court ruling to the Eleventh Circuit in E-Z Eating, 41 Corp.  On appeal, the franchise owners made several arguments, including "whether BKC frustrated the essential purpose of the Franchise Agreements in imposing the Value Menu." E-Z Eating, 41 Corp., 572 F.3d at 1313.  The Eleventh Circuit affirmed the District Court's determination that Section 5(A) provided BKC the authority to impose the Value Menu on its franchisees stating:

> We agree with the district court on this point.  Section 5(A) of the Franchise Agreements provided that the franchisee "agrees that

---

[5]The language of Section 5 the District Court analyzed in E-Z Eating 8th Corp. is identical to the language of Section 5 before this Court.

[6]The District Court further held that because BKC did not breach the franchise agreement by imposing the Value Menu, it did not violate its duty of good faith and fair dealing. E-Z Eating 8th Corp., at 14 ("A party cannot maintain a claim for breach of the implied covenant of good faith and fair dealing in the absence of breach of an express term of the underlying contract.").

> changes in the standards, specifications and procedures may
> become necessary and desirable from time to time and agrees to
> accept and comply with such modifications, revisions, and additions
> to the MOD Manual which BKC in the good faith exercise of its
> judgment believes to be desirable and reasonably necessary." There
> is simply no question that BKC had the power and authority under
> the Franchise Agreements to impose the Value Menu on its
> franchisees.

Id. at 1314. Despite the Eleventh Circuit's explicit ruling on BKC's authority to impose the

Value Menu under Section 5(A) of the Agreement, the NFA argues that the only issue "squarely

addressed and actually decided" was the franchise owners' argument that BKC breached its duty

of good faith and fair dealing by denying them an exception to the Value Menu program. See

Pl.'s Resp. at 2. This argument is misguided, however, as the franchise owners' argument on

good faith and fair dealing was clearly one of two arguments addressed and decided by the

Eleventh Circuit. Moreover, although the franchise owners admitted in deposition that they

understood BKC had the right to impose the Value Menu, it is clear that both the District Court

and the Eleventh Circuit made independent evaluations of Section 5.

The NFA also asserts that *stare decisis* does not apply here because the litigants never

raised, and therefore the Eleventh Circuit never considered, a number of new and different issues

presented by the NFA's Complaint. Pl.'s Resp. at 8. NFA relies heavily on Beacon Oil Co. v.

O'Leary, 71 F.3d 391 (Fed. Cir. 1995), in which the Federal Circuit refused to apply *stare decisis*

where the plaintiff raised issues that were not litigated or resolved by the prior decision. That is

not the case here. As in E-Z Eating, 41 Corp., the issue in this case is whether BKC has the

authority under the Agreement to impose maximum prices through its Value Menu. The Eleventh

Circuit determined, as a matter of law, that the clear and unambiguous language of Section 5(A)

of the Agreement grants BKC the right to impose the Value Menu on its franchisees. Any new purported factual arguments raised by the NFA are inapposite in the face of a legal determination made on the clear and unambiguous terms of Section 5(A). Accordingly, this Court must follow the binding legal precedent of the Eleventh Circuit.

>    2.    Construction of Section 5

Even under an independent analysis of Section 5 by this Court, the third court to do so, the NFA's claim that Section 5 does not grant BKC the authority to impose maximum prices still fails as a matter of law. Both Parties argue that Section 5 is unambiguous and this Court agrees. Under Florida law, where the language of an agreement is unambiguous, its interpretation is a matter of law for the court to decide. Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1066 (11th Cir. 2004) (citing Press v. Jordan, 670 So. 2d 1016, 1017 (Fla. 3d Dist. Ct. App. 1996). The NFA cites Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So. 2d 404 (Fla. 1974), for the proposition that a court must interpret an unambiguous provision by looking to the surrounding circumstances and the parties' course of dealing. Tr. at 10:14-19. Each Florida court that has specifically cited Blackhawk for this principle has done so in the context of an ambiguous contractual provision. See Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc., 832 So. 2d 147, 151-52 (Fla. 5th Dist. Ct. App. 2002) (holding surrounding circumstances and course of dealing are properly considered where lease is ambiguous); Bombardier Capital, Inc. v. Progressive Mktg. Group, Inc., 801 So. 2d 131, 134 (Fla. 4th Dist. Ct. App. 2001) (holding intent of parties governs the construction of a written contract but where a contract is unambiguous, the parties' intent must be garnered from the contractual language); Mayflower Corp. v. Davis, 655 So. 2d 1134, 1137 (Fla. 1st Dist. Ct. App. 1994) (holding surrounding circumstances and course

14

of dealing are properly considered where contract is ambiguous); <u>Vienneau v. Metro. Life Ins.</u>

<u>Co.</u>, 548 So. 2d 856, 859 (Fla. 4th Dist. Ct. App. 1989) (same). The Parties and the Court agree

that Section 5 is unambiguous. Where the language of the contract is clear and unambiguous, its

proper interpretation must be garnered from the language of the contract. <u>See</u> <u>Bombardier</u>

<u>Capital, Inc.</u>, 801 So. 2d at 134.

Section 5 of the Agreement provides in pertinent part:

> **5. Standards and Uniformity of Operation**
>
> BKC Shall establish, and cause approved suppliers to the Burger King System to reasonably comply with product, service and equipment specifications as established by BKC from time to time . . . .
>
> **A. M.O.D. Manual**
>
> FRANCHISEE acknowledges and agrees that prompt adaptation of and adherence to BKC's comprehensive restaurant format and operating system, including a standardized design, decor, equipment system, color scheme and style of building and signage, uniform standards, specifications and procedures of operation, quality and uniformity of product and services offered and the provisions of the Manual of Operating Data (the "MOD Manual"), as amended from time to time, are reasonable, necessary and essential to the image and success of all Burger King Restaurants (the "Burger King Restaurant System"). The MOD Manual contains the official mandatory restaurant operating standards, specifications and procedures as prescribed from time to time by BKC for the operation of a Burger King Restaurant . . . .
>
> FRANCHISEE agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary . . . . The MOD Manual and other specifications, standards and operating procedures communicated in writing to FRANCHISEE shall be deemed a part of this Agreement.

Agreement § 5(A), Def.'s Mot. Ex. A (dkt # 17-1). This Section clearly grants BKC the

authority to establish and make changes in its comprehensive restaurant format and operating

15

system, including product specifications. Each Franchisee who signs the Agreement also agrees to accept and comply with additions to the MOD Manual and any such changes communicated in writing. The NFA's Complaint alleges "that at some point in the past few years, BKC inserted an update to its Operations Manual (which is part of the MOD Manual) that purports to require a value menu (Value Menu) with items priced at $1.00 . . . ." Compl. ¶ 20. NFA also alleges that in 2002, BKC issued a written "99 cent BK Value Menu Policy Statement" informing Franchisees that the Value Menu was now a required menu item listed in BKC's Operations Manual and that, unless a Franchisee applied for and was granted an exception, all Franchisees must comply with maximum prices on the Value Menu. Value Menu Policy Statement, Def.'s Mot. Ex. C at 2 (dkt # 17-3). Under the clear terms of Section 5(A), the addition of the Value Menu to the MOD Manual was within BKC's authority to establish and make changes to its comprehensive restaurant format, including product specifications. Both the addition to the MOD Manual and the "99 cent BK Value Menu Policy Statement," communicated in writing to the Franchisees, were deemed a part of the Agreement provided they were made in good faith.

The NFA also argues that because it was per se illegal to set maximum prices prior to 1997, the terms of the Agreement could not grant BKC the right to fix prices because the Agreement was drafted prior to 1997. As NFA notes in its Response, maximum price fixing was a per se violation of the Sherman Antitrust Act under Albrecht v. Herald Co., 390 U.S. 145 (1968), until the Supreme Court, in 1997, overruled Albrecht in State Oil Co. v. Khan, 522 U.S. 3 (1997). Pl.'s Resp. at 3. As a matter of law, "[t]he laws in force at the time of the making of a contract enter into and form a part of the contract as if they were expressly incorporated into it." Fla. Beverage Corp. v. Div. of Alcoholic Beverages and Tobacco, Dept. of Bus. Reg., 503 So. 2d

16

396, 398 (Fla. 1st Dist. Ct. App. 1987) (citations omitted). The date the Agreement was drafted

is therefore irrelevant. The date the Agreement was entered into is the operative date. The

NFA's argument would thus apply only to those Franchisees who signed their Agreement prior to

1997. Even with respect to those Franchisees, this Court sees no reason why BKC's authority

under Section 5 to establish and make changes from time to time to its product specifications

would not give BKC the authority to impose maximum prices after the Khan decision. While the

Agreement incorporated the law in place at the time the Agreement was signed prior to 1997,

Section 5 also provided that BKC could, from time to time, modify, revise, and add to its

comprehensive restaurant format and operating system. It is this provision that allows BKC to

impose maximum prices even as to those Franchisees who signed their Agreements prior to 1997.

Under the terms of Section 5, each Franchisee agreed to such changes and additions so long as

they were made by BKC in good faith. The Franchisees are thus not left without a remedy. Even

though BKC has the authority under Section 5 to impose maximum prices, the NFA can challenge

the imposition of the maximum prices under the good faith provision of Section 5.[7] The NFA has

done so here in the case of the DCB. Accordingly, to the extent the NFA requests a declaration

that BKC does not have the authority under the Agreement to impose maximum prices on the

Franchisees, the NFA's Complaint is dismissed.

      3.    BKC's Duty of Good Faith

    With respect to the DCB, the NFA alleges that BKC violated its duty of good faith by

---

[7]The NFA could also file a suit challenging BKC's maximum price fixing under antitrust law. While State Oil Co. v. Khan, 522 U.S. 3 (1997), held that maximum pricing was no longer a *per se* antitrust violation, it also held that maximum pricing was subject to analysis under a "rule of reason." 522 U.S. at 22.

setting the maximum price at $1.00, forcing the Franchisees to sell the DCB at a loss.  Compl. ¶ 21.  The NFA also alleges that BKC has admitted that the sale of the DCB at $1.00 could lead to bankruptcy of its franchisees.  Id.  Construed in a light most favorable to the NFA, these allegations plausibly state a claim that BKC breached its duty of good faith.  As a result, although this Court determines that Section 5 grants BKC the authority to impose maximum prices, this case shall proceed to determine whether BKC's decision to impose the $1.00 DCB violated its contractual or implied duty of good faith.[8]

## IV.    CONCLUSION

In light of the foregoing, it is

ORDERED AND ADJUDGED that BKC's Motion to Dismiss (dkt # 17) is GRANTED IN PART.  The Motion is GRANTED to the extent it seeks dismissal of the NFA's claim that BKC does not have the authority under the Agreement to set maximum prices.  The Motion is DENIED with respect to the NFA's claim that BKC's imposition of the $1.00 DCB violates its duty of good faith.

---

[8]BKC also moved to dismiss on the grounds that the five-year statute of limitations period under Florida law for breach of contract had expired.  See § 95.11(2)(b), Fla. Stat. (the statute of limitations for a contract founded on a written instrument is five years). Actions for declaratory relief do not have their own statute of limitations. Rosenbaum v. Becker & Poliakoff, P.A., No. 08-81004-CIV-KAM, 2010 WL 376309, at *8 (S.D. Fla. Jan 26, 2010) (citations omitted).  Courts therefore must "borrow the forum state's limitations period for the most analogous state law cause of action . . . ." Harrison v. Digital Health Plan, 183 F.3d 1235, 1238 (11th Cir. 1999). NFA's claim here is most analogous to a breach of contract.  Florida's statute of limitations applies because the Agreement contains a Florida choice of law provision that governs this dispute.  Agreement § 21.C(1), Def.'s Mot. Ex. A (dkt # 17-1). BKC argues that the NFA's claim is barred by the statute of limitations because the breach, if at all, occurred in 2002 when BKC first asserted it had the right to impose maximum prices and subsequently did so.  It is clear, however, that this issue has already been determined by the Eleventh Circuit and this Court.  The only remaining issue is whether BKC breached its duty of good faith by imposing the $1.00 DCB.  This issue arose in 2009, clearly within the five-year statute of limitations period under Florida law for breach of contract.

18

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2010.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:     Counsel of record