IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-23435-CIV-MOORE/SIMONTON

NATIONAL FRANCHISEE
ASSOCIATION, et al.,

        Plaintiffs,

vs.

BURGER KING CORPORATION,

        Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

THIS CAUSE came before the Court upon Defendant's Motion to Dismiss (ECF No. 112). Plaintiffs filed a Response (ECF No. 114) and Defendant filed a Reply (ECF No. 121).

UPON CONSIDERATION of the Motion, the Response, the Reply, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### I.  BACKGROUND

This case involves a dispute between Burger King Corporation ("BKC") and a group of its franchisees over BKC's decision to set a $1.00 maximum price for certain products that it designated for inclusion on its $1.00 Value Meal menu. An original class action complaint was filed on November 10, 2009 by the National Franchisee Association ("NFA"), an association comprised of approximately 75% of Burger King's individual franchisees. Compl. (ECF No. 1). In that Complaint, plaintiff NFA alleged that in October 2009 BKC had unilaterally required its franchisees to offer the double-cheeseburger ("DCB") for no more that $1.00 as part of the Value Meal menu. Compl. ¶ 34. NFA advanced two claims: (1) that BKC did not have the right under

its franchise agreements to unilaterally impose maximum prices for products sold by its franchisees; and (2) that even if BKC had such a right, its decision to set a $1.00 price for the DCB violated its duty to exercise its pricing judgment "in good faith." Id. ¶¶ 21, 42.

On May 20, 2010, this Court issued an Order granting in part Defendant BKC's Motion to Dismiss. Order Granting Def.'s Mot. Dismiss ("May 20 Order") (ECF No. 37). The factual background of that case is detailed in that Order and will not be repeated here. In that Order, this Court dismissed NFA's claim that BKC did not have the right under its franchise agreements to set the maximum prices for products sold by franchisees. Id. at 18. Based on the Eleventh Circuit's recent decision in Burger King Corp. v. E-Z Eating, 41 Corp., 572 F.3d 1306 (11th Cir. 2009), which directly decided the issue, as well as an independent analysis of the pertinent provisions of the franchise agreements, this Court ruled that the agreements unambiguously conferred on BKC the right to require franchisees, without their consent, to offer designated items as part of its Value Meal menu and therefore to set unilaterally maximum prices for those items. May 20 Order at 13-14, 17.

At that stage, this Court did not dismiss NFA's remaining claim that BKC had acted in bad faith by setting the maximum price of the DCB at $1.00. Construing the allegations in the light most favorable to Plaintiff, it appeared that NFA was alleging that the impact of the pricing decision was so severe that it threatened franchisees with bankruptcy and that BKC, when it set the price, knew that such a decision was threatening the economic viability of its franchisees. Id. at 18.

In April 2010, BKC stopped requiring franchisees to sell the DCB for $1.00 and raised the maximum price for that item to $1.29. Consolidated Class Action Compl. ("Consolidated

Compl.") (ECF No. 102) at ¶ 52. BKC also introduce a new menu item, the "Buck Double," which is allegedly the same product as the DCB less one slice of cheese, and required franchisees to sell the Buck Double for $1.00. Id. On July 16, 2010, this Court granted NFA's motion to file a supplemental complaint. Order Granting Pls.' Mot. Leave (ECF No. 68). The case was also consolidated with Family Dining Inc. v. Burger King Corp., Case No. 10-21964-CIV-MORENO (S.D. Fla.), which had been filed on June 15, 2010 by a number of individual franchisees, and which raised essentially the same issues as NFA's original complaint. On August 27, 2010 the Plaintiffs in the consolidated cases filed a Consolidated Class Action Complaint ("Consolidated Complaint").[1] In this Complaint, Plaintiffs allege that for the six-month period from mid-October 2009 to mid-April 2010, they were required by BKC to offer the DCB for $1.00 and that this was below the cost of that particular item. Consolidated Compl. ¶¶ 46, 47. They further allege that since April 2010, they are still being required to sell the Buck Double for $1.00 and this is also below the cost of that product. Id. ¶¶ 52, 55.

Based on these allegations, Plaintiffs state four claims for relief. First, they claim that BKC breached its express duty of good faith under the franchise agreements by requiring the franchisees to sell the DCB and Buck Double below cost. Id. ¶ 62. Second, they claim that by requiring such below cost sales, BKC violated an implied duty of good faith and fair dealing that applies to all contracts under Florida contract law. Id. ¶ 67. Third, Plaintiffs claim that they are entitled to declaratory judgment stating that they are not obligated under the franchise agreements to abide by the prices set by BKC for the DCB or the Buck Double. Id. ¶ 75. Finally, they allege

---

[1] Plaintiffs in the Consolidated Action include the NFA and the following Individual Plaintiffs: Family Dining Inc., Restaurant Associates of Cincinnati, Inc., Bravogrand, Inc., ERW, Inc., and Atlantic Coast Foods, Inc.

BKC violated Florida's Deceptive and Unlawful Trade Practices Act ("FDUTPA") by allegedly failing to disclose in its offering circular to prospective franchisees that it had the power to set prices. Id. ¶ 81.

Defendant BKC moves to dismiss the first three claims. Def.'s Mot. Dismiss (ECF No. 112). As to Plaintiffs' first claim, BKC contends that Plaintiffs fail to allege facts sufficient to raise a claim that BKC acted in bad faith in setting the disputed prices. Id. at 3-4. BKC points out that, while Plaintiffs' original pleadings suggest an impact so severe as to threaten franchisees with bankruptcy, the Consolidated Complaint only alleges that franchisees will have losses on the single product at issue. Id. Nowhere do Plaintiffs allege that the prices on this single product will have a substantial adverse effect on their overall business, much less that it would impair their overall financial viability. Id. at 7-8. BKC argues that, where a business involves the sale of numerous products, there are a variety of legitimate reasons why a franchisor might require that a single product be sold below cost for a period of time. Thus, the mere fact that a single product is priced below cost does not suggest bad faith. Therefore, BKC argues, Plaintiffs have failed to adequately plead a bad faith claim.

BKC also seeks dismissal of Plaintiffs' second claim–a breach of the implied duty of good faith and fair dealing–on the grounds that the duty in this case is expressly set forth in the contract and therefore the concept of an implied duty is inapplicable and duplicative. Id. at 13. BKC seeks dismissal of Plaintiffs' declaratory judgment claim on the grounds that it is essentially a second attempt at the contract theory which this Court has already rejected and dismissed. Id. at 12.

## II.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). On a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "But where the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'shown'--'that the pleader is entitled to relief.'" Id. at 1950. A complaint must also contain enough facts to indicate the presence of the required elements. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1302 (11th Cir. 2007). However, "[a] pleading that offers 'a formulaic recitation of elements of a cause of action will not do.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.  ANALYSIS

### A.  Plaintiffs' First Claim: Insufficiency of Allegations that BKC Acted in Bad Faith

This Court has previously ruled that Section 5 of BKC's franchise agreements expressly grants BKC the discretion to set maximum prices for products sold by its franchisees. May 20

Order at 18. That provision explicitly imposes on BKC a duty of good faith when it decides on setting prices. Specifically, Section 5 states that BKC can make changes to standards and specifications "which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary." Franchise Agreement § 5(A) (ECF No. 17-1). Thus, judgment whether a particular measure is needed is one for BKC to make and the discretion to make these pricing decisions is vested in BKC. To the extent that Section 5 limits this discretion, it requires only that BKC makes its judgment "in good faith"– with the honest belief that the measure it is adopting will help the company meet competition and succeed in the marketplace. In cases such as this, where one party to a contract is assigned discretion to make certain types of decisions, a plaintiff does not adequately raise a claim of "bad faith" merely by making a conclusory assertion that the party acted in bad faith in exercising its discretion. If such naked assertions were enough to launch and maintain litigation, the exercise of any contractual discretion would be seriously burdened and the very function of contracts undermined in cases such as this. Twombly's factual sufficiency standard requires that plaintiffs set forth some factual allegations that support their claim that defendant acted in bad faith. Twombly, 550 U.S. at 570. Here, Plaintiffs do not deny that they are required to allege the facts indicative of bad faith. On the contrary, in paragraph 62 of the Consolidated Complaint, Plaintiffs cite four facts as the basis of their claim: (1) that the price set by BKC caused franchisees to sell the DCB and Buck Double at a loss; (2) that BKC adopted the prices despite the franchisees' disapproval; (3) that BKC sent information to its franchisees to justify its decision that was allegedly "inaccurate, deceptive and/or manipulative;" and (4) that BKC imposed the prices even though "all" the data showed that those prices would cause the franchisees "to suffer losses." Consolidated Compl. ¶ 62. The central issue here is

whether those factual allegations are, at the Motion to Dismiss stage, sufficient to state a claim of bad faith. This Court concludes that they are not.

The motive of BKC in exercising its discretion to set prices under the contract is key. Where one party to a contract accuses the other of exercising its contract rights in bad faith, it is claiming that the other party has dishonestly invoked a contract provision "to achieve a purpose contrary to that for which the contract had been made." Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273 (7th Cir. 1992). In other words, bad faith involves a subterfuge or evasion of contractual duties. Although the offending party claims to be exercising a power for the purposes defined in the contract, it is in fact using that power to achieve some other purpose–a purpose that is contrary to the contract and impermissible because it is so harmful to the other party as to deprive it of its reasonable expectations under the contract.

In such cases, there are at least two ways a plaintiff can go about raising a claim of bad faith. Plaintiffs can allege facts identifying defendant's improper ulterior motive(s). For example, if a franchisee had evidence that a franchisor had a secret agenda to take over the franchise and operate it as a company-owned business, and was deliberately setting prices to weaken the targeted franchisee, such a plaintiff could raise a claim of bad faith by alleging the existence of that plan. See Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1131 (N.J. 2001) (ruling plaintiffs' allegation that oil company set prices with specific intent to impair franchisee businesses to replace them with company-owned stations raised a claim of bad faith). It is more likely, however, that plaintiffs will lack direct evidence of dishonesty. In these cases, plaintiffs must allege facts indicating that defendant's stated purpose for its actions is merely a pretext for the actual impermissible purpose. This generally requires plaintiff to allege some facts tending to

show that "no reasonable person" could have thought that the steps taken by the defendant were a reasonable means of carrying out the contract's defined purposes. See, e.g., Barnes v. Diamond Aircraft Indus., Inc., 499 F. Supp. 2d 1311, 1321 (S.D. Fla. 2007) (a party's discretionary pricing decision will not violate good faith "unless no reasonable party would have made the same discretionary decision") (inner quotations and citations omitted); see also Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1097-98 (Fla. 1st Dist. Ct. App. 1999) (stating "where the terms of the contract afford a party substantial discretion. . . , the duty to act in good faith. . . limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party"). If no reasonable person would have exercised discretion as defendant had, the natural inference is that defendant must have had some hidden improper motive.

In alleging capriciousness of defendant's actions, the magnitude of the injury claimed by plaintiff is of central importance. No inference of bad faith arises simply because an exercise of contractual discretion has some marginal economic impact on the plaintiff. See, e.g., Wilson, 773 A.2d at 1130 ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."). On the other hand, an inference of bad faith may arise when the defendant exercises discretion in such a manner as to effectively destroy whatever benefits the plaintiff could have reasonably expected under the contract. The logic is that the measure with such severe results could not have been within the contemplation of the parties.[2]

---

[2] In Abbott v. Amoco Oil Co., 619 N.E.2d 789 (N.D. Ill. 1993), the Appellate Court of Illinois affirmed the lower court's dismissal of a complaint in which gasoline dealers sued Amoco Oil for, inter alia, breach of the implied covenant of good faith and fair dealing in exercising a pricing provision. The Appellate Court found that because any price increase Amoco would impose on the dealers would affect them adversely, bad faith needed to be pleaded

Applying these principles to the Consolidated Complaint, none of the facts alleged by plaintiffs in paragraph 62 are sufficient to support a claim of bad faith. The purpose of Section 5 is to give BKC broad discretion in framing business and marketing strategy by adopting those measures it judges are needed to help the business successfully compete. As explained above, to adequately raise a claim of bad faith, Plaintiffs must allege some facts suggesting that BKC did not believe that the prices would be helpful to the businesses competitive position, but, for some other reason, deliberately adopted prices that would injure Plaintiffs' operations. As currently pled, none of the allegations support such an inference of bad faith. Plaintiffs rely principally on their allegation that franchisees could not produce and sell DCB or Buck Doubles at a cost less than $1.00, and therefore that franchisees suffer "a loss" on each of these items sold. Even taken as true, there is nothing inherently suspect about a such a pricing strategy for a firm selling multiple products. There are a variety of legitimate reasons why a firm selling multiple products may choose to set the price of a single product below cost. Among other things, such a strategy might help build goodwill and customer loyalty, hold or shift customer traffic away from competitors, or serve as "loss leaders" to generate increased sales on other higher margin products. See, e.g., Parrish Oil Co., Inc. v. Dillon Cos., 523 F.3d 1244, 1254 (10th Cir. 2008) (stating that "loss leaders can have legitimate economic purposes and effects" including building goodwill and customer loyalty or attracting consumers to buy other items at regular or inflated

---

affirmatively. Bad faith was not sufficiently pled when dealers did not allege: (1) that they had been placed in severe financial trouble; (2) that Amoco's pricing was an aberration from the practices of other oil companies; and (3) that Amoco did not have any legitimate business purpose for its actions. In other words, the dealers did not allege improper motives on the part of Amoco, nor did they allege such serious financial trouble caused by capricious actions as to create an inference of improper motive. Plaintiffs in the present case have similarly failed to satisfy either of these pleading requirements.

prices). The issue is not whether such a strategy was wise or ultimately successful or mistaken. In the absence of some other evidence of improper motive, the question is whether it was so irrational and capricious that no reasonable person would have made such a decision. There is nothing about the pricing decision that suggests BKC was doing anything other than seeking to promote the performance of its franchisees. Nothing about this action suggests bad faith.

Plaintiffs argue that Section 5 does not give BKC the discretion to set a "below cost" price for any single product. The premise seems to be that requiring a franchisee to sell anything at below cost is per se bad faith. As the foregoing discussion makes clear, that is clearly not the case. Section 5 gives BKC the right to set prices for products sold by franchisees. This includes the discretion to set prices for a single product below cost provided that the pricing decision is one "which BKC in the good faith exercise of its judgment believes to be desirable and necessary." A decision to price a single product below cost is not automatically a bad faith exercise.

A further flaw with Plaintiffs' bad faith claim is that they do not allege the kind of serious injury that would support an inference of bad faith. Rather than claim a substantial impact on their overall business, plaintiffs focus on the losses allegedly incurred on the single product sold below cost–the DCB and the Buck Double. The terms used by Plaintiffs in paragraph 63 to describe their economic injury relate to the "loss," the absence of "appropriate profit margin," and the "lost profits" on the DCB and Buck Double products standing alone. Consolidated Compl. ¶ 63. Almost any standard or specification set by BKC–whether it relates to pricing, labor, advertising, or safety–could be characterized as resulting in "losses" or less margin or profit when viewed on one item alone. Further, even if Plaintiffs are alleging that the cumulative

losses on the single product deprived them of "appropriate profits" in the overall business, the claim is so vague as to be meaningless. Again, any discretionary measure adopted by BKC which imposed costs or reduced revenues on any single product could be characterized in some sense as depriving franchisees of profits.[3]

As explained above, to the extent plaintiffs seek to raise a claim of bad faith by pointing to the injuries allegedly caused them by BKC's decision, plaintiffs must allege that the damage to their overall business was so severe as to deprive them of their reasonable expectations under the contract. The basic question is whether the impact has been so injurious that the measure could not reasonably have been considered within contemplation of the parties. Plaintiffs come nowhere close to alleging such an impact. Significantly, nowhere do plaintiffs claim that their overall business has been appreciably impaired. Nor do they allege that their overall businesses are no longer profitable or that their competitive positions or economic viability going forward

---

[3] There is further difficulty with Plaintiffs' bad faith claim that warrants attention. Twombly requires that a plaintiff set forth sufficient facts to state a claim for relief that "is plausible on its face." Twombly, 550 U.S. at 570. One aspect of Plaintiffs' claim that affects plausibility is Plaintiffs' failure to explain how it could possibly be in BKC's interest to susbtantially harm all its franchisees. Both franchisor and franchisees have a general common interest in advancing the overall business. Plaintiffs are claiming that BKC set a price to deliberately hurt all of its franchisees. Such a claim would seem implausible. Perhaps there is some equilibrium point at which BKC's business can flourish while it causes its franchisees to suffer, but Plaintiffs have not alleged that. Thus, there is a tension underlying the claim. The more Plaintiffs seek to show bad faith, by dramatizing the magnitude of the economic injury caused by the pricing decision, the less plausible the claim becomes.

11

are threatened.[4]

Turning specifically to the four allegations in paragraph 62, the first and fourth simply refer to the alleged fact that Plaintiffs were required to sell DCB's and Buck Doubles below cost. For the reasons discussed above, neither of these alleged facts are sufficient to state a claim of bad faith. The second allegation simply refers to the facts that BKC set the prices without the approval of the franchisees. But, as this Court has already held, BKC has the unambiguous right to exercise its own discretion in setting prices and can do so without the approval of franchisees. The mere fact that BKC made a unilateral decision to set the prices of the DCB and the Buck Double in no way suggests that BKC acted in bad faith. Finally, the Plaintiffs' third allegation asserts that in arguing for the $1.00 price for DCB, BKC gave data to the franchisees which was "inaccurate, deceptive, and/or manipulative." Plaintiffs characterization of the cost data provided by BKC is insufficient to support a claim of bad faith. Not only is Plaintiffs' description of the data as "deceptive" a legal conclusion masquerading as a "fact," but more importantly, the dispute of the true costs of the DCB is ultimately irrelevant because BKC had the right to unilaterally set the price of the DCB at $1.00 even if it was below cost.

Thus, Plaintiffs have not sufficiently pled that BKC acted in bad faith. Accordingly, Count I of Plaintiffs' Consolidated Complaint is dismissed.

---

[4] In this Court's Order dated May 20, 2010, the allegations were construed in the light most favorable to the Plaintiff. At that point, it appeared that the NFA was suffering severe losses when they alleged BKC's admission that the sale of the DCB could lead to the bankruptcy of franchisees. In the Consolidated Complaint, the parties now allege that resulting damages are actually "lost profits" from being forced to sell the DCB and Buck Double below cost. It is this change in the severity of the injury alleged that alters the present analysis from this Court's previous Order.

B.  Plaintiffs' Second Claim: Breach of Implied Duty of Good Faith

As this Court has concluded that Plaintiffs have failed to plead facts suggesting BKC breached an express duty of good faith, Plaintiffs cannot assert a claim that Defendant breached an implied duty of good faith. "There can be no cause of action for a breach of the implied covenant of good faith 'absent an allegation that an express term of the contract has been breached.'" Barnes, 499 F. Supp. 2d at 1320. Plaintiffs do not allege any other breach of the express terms of the Franchise Agreement. Thus, they may not state a claim based on a breach of the implied covenant of good faith and fair dealing.

Furthermore, the facts alleged by Plaintiffs for breach of the express duty of good faith and for breach of the implied duty of good faith are nearly identical. A claim of breach of the implied covenant of good faith may not be advanced when the allegations underlying that claim are duplicative of the allegations supporting a claim for breach of an express term in the contract. See, e.g., Regency of Palm Beach v. QBE Ins. Corp., No 08-81442-CIV, 2009 WL 2729954, at *5 (S.D. Fla. Aug. 25, 2009). Thus, Plaintiffs may not advance this claim because it relies on the same allegations as their breach of contract claim.

Accordingly, this claim is dismissed.

C.  Plaintiffs' Third Claim: Declaratory Relief

The claim for declaratory relief is merely a regurgitation of the claim already dismissed in Plaintiffs' original complaint. Plaintiffs request a judicial declaration that the Franchise Agreements do not obligate them to comply with pricing mandates set by BKC with respect to the DCB and the Buck Double. The Franchise Agreements unambiguously permit BKC to set the prices of the DCB and Buck Double. Plaintiffs are attempting to resuscitate a claim that has

been rejected by this Court and by the Eleventh Circuit Court of Appeals.

Therefore, this claim is dismissed.

D.  Plaintiffs' Fourth Claim: Florida's Deceptive and Unlawful Trade Practices Act

Plaintiffs allege that BKC has engaged in unfair and deceptive trade practices in violation of Florida's Deceptive and Unlawful Trade Practices Act ("FDUTPA"). Thus, the only basis of jurisdiction over this claim would be supplemental jurisdiction. "In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). However, "[t]he district courts may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(b)(3). Here, this Court declines to exercise supplemental jurisdiction over the Florida state law claim.

Accordingly, Plaintiffs' final claim is dismissed without prejudice.

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendant's Motion to Dismiss (ECF No. 112) is GRANTED. It is further

ORDERED AND ADJUDGED that Counts I, II, and III of Plaintiffs' Consolidated Complaint (ECF No. 102) are hereby DISMISSED WITH PREJUDICE. It is further

ORDERED AND ADJUDGED that Count IV of Plaintiffs' Consolidated Complaint is hereby DISMISSED WITHOUT PREJUDICE.

CASE NO. 09-23435-CIV-MOORE/SIMONTON

The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 19th day of November, 2010.

*K. Michael Moore*
K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record